## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 24-CR-20255-WPD/HUNT

**UNITED STATES OF AMERICA**

**vs.**

**PATRICK BOYD and**
**CHARLES BOYD,**

      **Defendants.**

_____/

### UNITED STATES' SENTENCING MEMORANDUM AND RESPONSE TO DEFENDANTS' OBJECTIONS TO PRE-SENTENCE INVESTIGATION REPORTS

The United States of America submits its consolidated sentencing memorandum and response in opposition to Defendants Patrick Boyd and Charles Boyd's objections to the United States Sentencing Guidelines ("USSG") calculations in their respective Draft Presentence Investigation Reports (the "PSRs").

## INTRODUCTION

Patrick and Charles Boyd orchestrated a nationwide HIV drug diversion scheme that harmed vulnerable HIV-positive patients, placed countless others at risk, and corrupted the supply chain for prescription drugs in the United States, all in pursuit of profit. And they did this with full knowledge of the serious harm their reprehensible crimes could, and did, cause.

To carry out their crimes and evade detection from law enforcement, the Defendants took elaborate steps to conceal their conduct and create the façade that they were running a legitimate wholesale pharmaceutical business. They concealed facts from their Director of Compliance and salespeople. They sold black-market HIV drugs with falsified paperwork designed to conceal the drugs' illicit origin from both customers and the FDA. They even lied to and misled their own

lawyers to manipulate the legal advice they were provided and shield critical evidence of their intent from discovery.

The PSR's calculation of their total offense level – far exceeding the maximum – speaks to the severity and complexity of their crimes. In fashioning an appropriate sentence, the Court must consider the seriousness of the offenses, the need to deter these Defendants and others like them who believe they are above the law, the need to curb prescription drug diversion schemes that remain prevalent here in South Florida and nationwide, and the need to promote respect for the law. Based on these factors, as well as the overwhelming evidence of the Defendants' conscious disregard for human life, the United States respectfully submits that a just sentence for these two Defendants should be measured in decades, not merely months or years.

While the Defendants repeatedly urge the Court to calculate their Guidelines just a few levels above that of co-defendant Adam Brosius, doing so would be unjust and unwise for several reasons.

**First**, Brosius began cooperating shortly after his arrest, executing plea documents in August 2024. Such early acceptance of responsibility and cooperation is almost always rewarded, as it should be.

**Second**, Brosius agreed to plead guilty long before the government obtained much of the evidence it presented at trial, which was withheld on privilege grounds until shortly before trial. The government did not have the benefit of any of that evidence at the time of Brosius's negotiated plea.

**Third**, Brosius was not present at Safe Chain's facilities, instead working remotely from his home in Florida. As a result: (a) he was not in the warehouse when the dirty bottles of diverted HIV drugs were delivered by Boulevard 9229 and the other black-market suppliers, and Khaim's

testimony and corroborating documents did not implicate him nearly as much as Charles Boyd; (b) he did not manage and manipulate Safe Chain's compliance department or its salespeople, nor did he repeatedly conceal information from, mislead, and lie to Safe Chain's lawyers like the Boyds did; (c) there was no evidence Brosius read or even received the Defendants' Standard Operating Procedures, which identified nearly all the signs of drug diversion these two Defendants flagrantly disregarded; and (d) he did not instruct Safe Chain employees not to put things in writing, as the Defendants did.

**Fourth and finally**, there was no evidence he received the July 2018 email attaching an article discussing prescription drug diversion schemes or the Queens Daily Eagle article Charles Boyd shared with Patrick Boyd during the early part of the conspiracy. Both articles made plain to the Defendants the devastating effects and risks posed by drug diversion schemes, particularly those involving life-saving HIV drugs, and were critical evidence of their knowledge, intent, and conscious disregard for the victims of their crimes.

Turning to the draft PSR, the U.S. Probation Office ("Probation") accurately described the offense conduct based on the evidence introduced at trial and correctly calculated the Guidelines for each Defendant, with one minor exception.[1] The Defendants' objections to the PSRs' characterization of the offense conduct and Guidelines calculations ignore the trial evidence, regurgitate defenses already presented and rejected by the jury, or are more properly considered as part of the Court's Section 3553(a) analysis at sentencing. The Court should overrule the Defendants' objections to the PSRs.

---

[1] Though not raised by the Defendants, if the Court applies the four-level enhancement pursuant to USSG § 2B1.1(b)(8)(B) – which it should – then it cannot also apply the two-level enhancement for abuse of public trust. *See* USSG § 2B1.1 comment. note 7. This brings the total offense level down from 53 to 51 but does not affect the Guidelines calculation.

## BACKGROUND

Following their convictions at trial, Probation issued draft PSRs for each Defendant. As to both Defendants, the PSRs calculate their offense levels as follows:

| | |
|---|---|
| Base Offense Level (USSG § 2B1.1(a)(1)): | 7 |
| Loss (USSG § 2B1.1 (b)(1)(M)): | +24 |
| Ten or more victims (USSG § 2B1.1(b)(2)(A)(i)): | +2 |
| Conduct described in 18 U.S.C. § 670 and Defendants were agents of organization in supply chain (USSG § 2B1.1(b)(8)(B)): | +4 |
| Sophisticated Means (USSG § 2B1.1(b)(10)(C)): | +2 |
| Conscious or reckless risk of death or serious bodily injury (USSG § 2B1.1(b)(16)): | +2 |
| Vulnerable Victims ("VV") (USSG § 3A1.1(b)(1)): | +2 |
| Number of VV (USSG § 3A1.1(b)(2)): | +2 |
| Abuse of Position of Trust/Special Skill (USSG § 3B1.3) | +2 |
| Obstruction of Justice (USSG § 3C1.1) | +2 |
| Role (USSG § 3B1.1(a)): | +4 |
| **Total Offense Level:** | **53** |
| **Adjusted Offense Level:** | **43** |

Both Defendants filed objections to large swaths of the PSRs, with significant overlap in their legal objections. Many of Charles Boyd's objections state in conclusory fashion that "there is insufficient evidence or facts to support this enhancement," or that a certain enhancement is "not

4

applicable." *See* ECF No. 268 at 9. Patrick Boyd's objections are a bit more detailed. ECF No. 269. Both are addressed below.

As to the PSR's description of the Defendants' offense conduct, Patrick Boyd objects, in relevant part, to: (a) the PSR's description that Brosius, Patrick Boyd, and Charles Boyd "orchestrated a complex prescription drug diversion scheme" and "recruited over five participants to facilitate the purchase and sale of diverted medications"; (b) the PSR's description that Brosius, Patrick Boyd, and Charles Boyd caused Safe Chain to make payments to their black-market suppliers; (c) the PSR's description that Boulevard 9229 shipped prescription medications to Patrick and Charles Boyd; (d) the PSR's statement that "on at least ten occasions, pharmacies reported receiving bottles labeled as HIV medications that instead contained an entirely different drug"; (e) the PSR's statement that Patrick and Charles Boyd took deliberate steps to conceal their criminal conduct; (f) the PSR's statement that Patrick and Charles Boyd lied to and misled Safe Chain's attorneys; and (g) the PSR's statement that Patrick Boyd was involved in the purchase of diverted prescription drugs. These objections ignore the overwhelming trial evidence and are addressed below as part of the Defendants' objections to the PSR's Guidelines calculations.

As to the Guidelines calculations, both Defendants object to the following enhancements: (a) loss amount; (b) the offense involved ten or more victims; (c) the offense involved the conscious or reckless risk of death or serious bodily injury; (d) the offense involved vulnerable victims and a large number of vulnerable victims; and (e) obstructing or impeding justice. Patrick Boyd alone objects to the sophisticated means enhancement; his role enhancement; and, it appears, the additional two levels for the offense involving conduct described in 18 U.S.C. § 670 combined with the fact that the Defendant was employed by or an agent of an organization in the supply chain for pre-retail medical products. Charles Boyd alone objects to the abuse of trust or use of a

special skill enhancement. The Defendants' objections overlook the extensive evidence presented at trial and lack legal support.

## ARGUMENT

The PSRs accurately describe the offense conduct based on the evidence presented at trial and correctly calculate the Guidelines, with one minor exception noted above. Patrick Boyd's factual objections rehash defenses he presented at trial, which the jury rejected when it found him guilty of seven counts charged in the indictment. Taken together, the Defendants disregard the evidence presented at trial, misinterpret the Sentencing Guidelines and their commentary, and cite little or no case law while urging the Court to reject all of the PSR's proposed enhancements. The PSRs apply the Guidelines based on the specific evidence admitted at trial. The Court should overrule the Defendants' objections and adopt the PSR's Guidelines calculations, with the minor exception discussed above. *Supra* fn. 1.

### I.    The Court Should Apply a 24-Level Enhancement For Loss.

Both Defendants' offense levels should be increased by 24 levels pursuant to USSG § 2B1.1(b)(1)(M). The PSR calculated losses of $92.8 million based on the amount the Defendants paid five black-market suppliers for diverted and previously dispensed HIV drugs. *See* GX 40 (Financial Summary Exhibit). Using the amount the Defendants paid for the illicit HIV drugs is, if anything, a conservative estimate of loss. The Defendants purchased these black-market drugs at steep discounts and resold them to pharmacies for profit. The pharmacies, in turn, dispensed these unsafe drugs to unsuspecting patients and were reimbursed for expensive drugs that had already been paid for by insurers, and therefore were not reimbursable. Calculating loss based on what the Defendants paid for HIV drugs they knew were diverted, knew had already been reimbursed by insurers, and knew would be reimbursed yet again actually understates the amount

of financial loss. The PSR's loss calculation is, therefore, a "reasonable estimate of the loss, given the available information." *United States v. Moran*, 778 F.3d 942, 973 (11th Cir. 2015).

### A. $92.8 million is a conservative and reasonable estimate of actual and intended loss.

The Sentencing Guidelines calculate loss as "the greater of actual loss or intended loss" and define intended loss to include the "pecuniary harm that the defendant purposely sought to inflict." USSG § 2B1.1 Notes (A), (C)(ii). The victims of the Defendants' fraud conspiracies included pharmacies, patients, and health insurers, with insurers ultimately footing the bill for their abhorrent criminal conduct.

The evidence at trial showed that the Defendants orchestrated a nationwide scheme to unlawfully distribute more than $92.8 million of diverted HIV drugs they purchased from at least five black-market suppliers. That the Boyd brothers knew about the illicit nature of these drugs from the outset was proven through the testimony of Peter Khaim, evidence corroborating Khaim, the testimony of their Director of Compliance, the testimony of their former lawyer, and the numerous complaints from pharmacy customers that started in May 2020 and continued throughout the conspiracies. *See, e.g.*, GX 353 (opened bottle with Albuterol foil in late May 2020); GX 116 (dirty bottle of previously dispensed Selzentry); GX 4 (Defendants discussing bottles with the wrong drugs in August 2020); GX 152 (photo of the condition in which Defendants received the drugs from Khaim); GX 183 (pharmacy complaint to Patrick Boyd about dirty and unsafe bottles in October 2020); GX 501 (texts Charles Boyd received regarding customer complaints); GX 503 (texts between Charles Boyd and Peter Khaim). Tellingly, around the time their Director of Compliance, Abigail Divilio, first discovered the falsity of Boulevard's T3s – September 29, 2020 – Charles Boyd shared a Queens Daily Eagle article with his brother

discussing an HIV drug diversion scheme strikingly similar to the one they were carrying out themselves. GX 645; GX 646.

The trial evidence also showed that both Defendants knew about the health insurance reimbursements for these expensive HIV drugs and knew their pharmacy customers would be paid by insurers for the diverted, non-reimbursable drugs. *See, e.g.*, GX 118 (email forwarded by Patrick Boyd discussing pharmacies' reimbursement for HIV drugs). This email showed the Defendants' knowledge that the pharmacies' reimbursements would be higher than what the Defendants paid for the drugs, underscoring the reasonableness of the PSR's loss calculation. The amount the Defendants paid for drugs they unlawfully distributed also accounts for the relevant factors under the Sentencing Guidelines, including the "scope and duration of the offense." USSG 2B1.1 Note 3(B). This loss calculation is limited to the time frame of the conspiracy, directly tied to the nature of the fraud proven at trial, and applies the same methodology used to calculate co-defendant Adam Brosius's loss amount, which is only lower because it is based on a narrower date range.

Raj Parekh, a pharmacy customer of the Defendants, testified at trial. Parekh testified that he would not have bought the illicit, expensive HIV drugs from the Defendants had he known about the numerous and consistent complaints from other customers who received wrong drugs in the bottles and opened bottles, among the many obvious signs the drugs were diverted. Tr. 09/30/25 at 188-214. In addition to Parekh's testimony, another customer of the Defendants, Andy's Pharmacy on Grand, submitted a Victim Impact Statement. This pharmacy victim – like other trial witnesses – emphasized the importance of supply chain integrity when it comes to life-saving HIV drugs: "HIV medications require strict adherence to supply-chain integrity due to the risks associated with improper handling, diversion, prior dispensing, or storage outside required

conditions." ECF No. 270-1. Similar to Parekh, he would not have purchased the drugs from Safe Chain had he known the Defendants "obtained these HIV medications from diverted or black-market sources, that the drugs had been previously dispensed or removed from the legitimate supply chain, or that the accompanying T3 documentation was false[.]" *Id.* Other pharmacy customers interviewed by agents made the same common sense, logical point: They would not have bought HIV drugs from the Defendants had they known their true origin. Obviously, had they not purchased the drugs from the Defendants, they also would not have been reimbursed by Medicare, Medicaid, and commercial insurers for these illicit drugs. Ultimately, the health insurers bore the financial costs of the Defendants' criminal conduct, and their losses certainly exceed the amount the Defendants paid for the drugs. *See, e.g.* GX 118.

Court decisions in similar cases involving the illegal distribution of consumer products support the PSR's conservative loss calculation. In *United States v. Gonzalez-Alvarez*, the First Circuit held that "where a product cannot be sold lawfully it has a value of zero for the purpose of calculating loss." 277 F.3d 73, 78 (1st Cir. 2002). That is precisely what the Defendants were convicted of doing here: Unlawfully selling diverted HIV drugs "value[d] at zero." Along the same lines, in *United States v. Marcus*, the Fourth Circuit affirmed a district court's use of a defendant's gross sales as an appropriate loss calculation. The Fourth Circuit wrote:

> The marketing of a drug employing an unapproved and untested formula, when the modification presents the potential to affect the ***safety, therapeutic value***, or bioequivalence of the drug, ***renders the drug of unknown efficacy and safety***; the sale of a drug represented to possess FDA approval under those circumstances does not provide consumers with the benefit of their bargain. In other words, such a change prevents the drug from being that which it purports to be. Given the unchallenged finding that consumers would not purchase a drug of unknown safety and efficacy at any price, the district court correctly concluded that Halsey's gross sales were the appropriate measure of the actual loss.

82 F.3d 606, 610 (4th Cir. 1996). The Defendants' gross sales figure is greater than what they paid for the drugs – they sold the drugs for a profit, after all – but still within the same loss range (more than $65 million but less than $150 million). *See, e.g.* GX 40L (financial summary showing revenues higher than and tracking payments to black-market suppliers); GX 303B (gross sales and margins). The testimony of Khaim, along with evidence corroborating him, established the extraordinary discount the Defendants paid for his diverted drugs – upwards of 20-30% off WAC – while other evidence proved they sold the drugs to pharmacies at lesser discounts of between 5-10% off WAC. *See, e.g.*, Tr. 10/08/2025 at 21; GX 118; GX 217 (Patrick Boyd emailing sales reps a spreadsheet listing the costs of Boulevard and Gentek's diverted drugs compared to the higher pricing they could offer customers).

**B. The Court should reject Patrick Boyd's unfounded objections to the PSR's loss calculation.**

Patrick Boyd urges the Court to reject the PSR's conservative loss calculation on various grounds, all of which are contrary to the evidence presented at trial, the Sentencing Guidelines, relevant case law, and common sense. He first argues the loss calculation is "troublesome" because "[i]t is not a loss amount it's a 'paid out' amount." The fact that the loss figure is what the Defendants paid for drugs they illegally distributed only makes it a more conservative loss calculation. These diverted and previously dispensed drugs – purchased from vulnerable patients off the street – would not have been purchased by pharmacies had they known their origin and should not have been paid for by health insurers. The illicit nature of the drugs rendered them worthless, but the Defendants effectively concealed that important fact. *See Gonzalez-Alvarez*, 277 F.3d at 78; *see also United States v. Segredo,* No. 07-20766-CR, 2010 WL 11519653, at *8 (S.D. Fla. Feb. 19, 2010) (Gold, J.), *aff'd*, 414 F. App'x 184 (11th Cir. 2011) (agreeing with and citing *Gonzalez-Alvaraz* and *Marcus* but applying a different methodology based on the government's

10

concessions).

Patrick Boyd next objects by arguing "[i]t is also not a profit amount." The Defendants' profits from selling worthless drugs they knew would be reimbursed by health insurers is not an appropriate or legally supported loss calculation. The Sentencing Guidelines define "[r]easonably foreseeable pecuniary harm" as "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." USSG § 2B1.1 Note (C)(iv). Both Defendants knew that health insurers would reimburse their customers for these worthless HIV drugs at amounts greater than what they paid for them. GX 118. That the paid amount understates actual losses favors the Defendants and supports the reasonableness of the loss calculation. Patrick Boyd cites no legal authority for using profits as the measure of loss in a massive fraud scheme like this one, and doing so would be contrary to the case law cited above. Basing the Defendants' loss amount on some unspecified profit figure would also be unjust and deter cooperation, given that Brosius began cooperating shortly after his arrest and agreed to a loss amount of $60.6 million based on the same methodology applied in the PSRs.

Patrick Boyd further objects that "[i]t is an approximation rather than a definitive amount." The amount the Defendants paid for the illicit drugs is a definitive amount that was proven at trial. GX 40. And the Court need only calculate a "reasonable estimate of the loss, given the available information." *Moran*, 778 F.3d at 973; USSG § 2B1.1, comment. note (3)(B). The amount the Defendants paid for the black-market drugs is a conservative calculation because the trial evidence showed that their gross sales, and the actual losses to insurers, were higher.

Patrick Boyd also contends that the PSR's loss calculation is "based on a theory of loss that is different from the theory used in Adam Brosius' case." That is wrong. The methodology used to calculate Brosius's loss amount is the same methodology applied here: The amount the three

11

Defendants paid to their five black-market suppliers. Brosius's loss of $60.6 million is lower than the Defendants' only because it was based on a different date range: September 30, 2020, through July 2021. There are compelling reasons for this. Brosius began cooperating almost immediately and executed plea documents long before the government obtained much of the evidence presented at trial. And unlike the Boyds, Brosius was not present at Safe Chain's offices, did not create or even see the Defendants' SOPs, did not receive the articles described above, and based on the trial evidence, arguably learned about the illicit nature of the HIV drugs later than the Boyds did.

Finally, Patrick Boyd argues the amount paid to their co-conspirator black-market suppliers "overstates the amount of actionable transactions," claiming there is no evidence the Defendants intended to inflict pecuniary harm and no evidence of any actual loss. Patrick Boyd urges the Court to apply a loss amount of **<u>zero</u>**, because the pharmacies – which the Defendants deceived – were reimbursed when they dispensed the diverted drugs and the reimbursements "were likewise valid because they were presumably reimbursing for medically necessary covered medications." ECF No. 269 at 7. While he is correct that the pharmacies were reimbursed for the previously dispensed drugs, they should not have been. Furthermore, as discussed above, the pharmacies would never have purchased these diverted drugs in the first place had the Defendants not concealed their illicit origin, meaning the drugs would never have been paid for by insurers. It defies common sense to suggest that these diverted and dangerous HIV drugs, which had already been paid for once, were properly reimbursed here. Instead, the insurers reimbursed the Defendants' pharmacy customers for HIV drugs that had "a value of zero[.]" *Gonzalez-Alvarez,* 277 F.3d at 78. Those reimbursements totaled more than what the Defendants paid for the drugs. Indeed, that was one reason the scheme was so successful. Once again, this only reinforces the fact that basing loss on what the Defendants paid for these drugs is both conservative and a "reasonable estimate of the

loss, given the available information." *Moran*, 778 F.3d at 973.

The Court should overrule Patrick Boyd's factually and legally unsupported objections to the loss amount, as well as Charles Boyd's conclusory objection, and apply the PSR's reasonable loss calculation.

**II.    The Court Should Apply a Two-Level Enhancement Because the Offense Involved Ten or More Victims.**

The Defendants were convicted for illegally distributing more than $92.8 million of diverted HIV drugs to pharmacies throughout the country, which dispensed thousands upon thousands of these bottles to countless unsuspecting HIV patients. The Defendants distributed over 8,000 bottles of diverted prescription drugs from Boulevard alone. *See* GX 305A. The massive number of falsified T3s introduced at trial proved there were far more than ten pharmacy victims, not to mention patients. *See, e.g.*, GX 85 (2,000+ page exhibit of false Boulevard T3s); GX 86-91. The Defendants sold over 28,000 bottles of Gilead-branded medications alone, to 363 different pharmacy customers.[2] Though there is no way to fully measure the true number of victims affected by the Defendants' crimes, the trial evidence indisputably proved there were ten or more victims. The testimony of patient victim Gustavo Borja and pharmacy victim Parekh are representative of other patient and pharmacy victims, which far exceed ten.[3] The government is also prepared to call a case agent to testify about interviews and evidence obtained regarding additional patient and pharmacy victims, if necessary.

---

[2] If necessary, the government will have an agent available to introduce spreadsheets created by Safe Chain in response to requests from Gilead Sciences and testify to these figures.

[3] This does not include the manufacturers of the drugs, who are also victims, or health insurers such as Medicare, Medicaid, and commercial insurers.

The widespread and disturbing impact of the Defendants' criminal conduct is aptly described in the article they shared and read early in the conspiracy but which did not dissuade them from continuing their crimes. GX 645-46. "The schemes hurt individuals with HIV, cost taxpayers millions of dollars and drive up the viral load in communities, exposing others to the illness and spoiling the city and state's mission to drive the number of new HIV diagnoses to zero." GX 646. Cities with high numbers of HIV patients are the ones the Defendants instructed their sales team to target. *See* GX 118 (Patrick Boyd forwarding an email to his sales team discussing New York City, Washington, D.C., and Atlanta as "three of the largest HIV markets in the country.").

The Court should overrule the Defendants' objections and apply this two-level enhancement pursuant to USSG 2B1.1(b)(2)(A) because the trial evidence indisputably proved that their offense conduct involved ten or more victims.

## III. The Court Should Apply a Four-Level Enhancement Because the Defendants Knew Their Conduct Impacted Large Numbers of Vulnerable HIV Patients.

The Sentencing Guidelines provide for a four-level enhancement where a defendant "knew or should have known that a victim of the offense was a vulnerable victim" and "the offense involved a large number of vulnerable victims." USSG § 3A1.1(b)(1) and (2). A "vulnerable victim" is defined as a person "who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." USSG § 3A1.1 comment. note 2. Patrick Boyd claims "[t]here was no evidence introduced at trial describing any unique vulnerability, nor was there evidence of a large number of vulnerable victims." ECF No. 269 at 11. He is wrong.

The government introduced abundant evidence that the Defendants knew the ultimate consumers of the massive amount of diverted HIV drugs they sold were, of course, HIV patients.

From Boulevard alone, the Defendants distributed over 7,000 bottles of HIV medication that were obtained off the street by Khaim's "runners." GX 305A. These is no way of knowing how these bottles were stored, handled, or when they expired, not to mention the reported instances in which they contained different drugs entirely. The bottles were then dispensed to some of the most vulnerable members of our society: HIV-positive patients who depend on their life-saving medication. As the Defendants well-knew early in the conspiracies, "HIV is a weird disease where you have to have 90 to 95 percent maintenance. You can't miss a day." GX 646. One of the Defendants' victims, Borja, made this exact same point:

> Q. Is it an important medication for you?
>
> A. Absolutely.
>
> Q. Why is that?
>
> A. Because it's my life.
>
> Q. Okay.
>
> A. I can't skip any day my medicine; so we take it every day.
>
> Q. What is your understanding of why you shouldn't skip a day of this medication?
>
> A. Well, I know for a fact that my viral load in my blood can go up and can pretty much kill me if I miss my pills

Tr. 09/19/2025 at 60.

Worse still, Divilio testified that the Defendants attempted to explain away the complaints from customers by ***blaming*** the vulnerable victims of their crimes, even going so far as to describe them as "junkies." Tr. 09/19/2025 at 139-40. The Defendants not only knew their victims were vulnerable, they also disdained them.

Courts in this district and the Eleventh Circuit have applied and affirmed application of

this enhancement in cases where individuals with substance abuse disorders were affected by a defendant's conduct. *See, e.g.*, *United States v. Abovyan*, 18-cr-80122-DMM (S.D. Fla.), Feb. 13, 2019 Sentencing Tr. at 37; *Moran*, 778 F.3d at 978 (11th Cir. 2015) (victims with substance abuse disorders "were vulnerable because of their need for treatment"); *United States v. Birge*, 830 F.3d 1229, 1233-34 (11th Cir. 2016) (affirming application of vulnerable victim enhancement and rejecting any requirement that vulnerable victims must be "targeted," explaining that the vulnerable victim enhancement applies "so long as the defendant 'knew or should have known that a victim of the offense was a vulnerable victim.'"). Here, the trial evidence showed that vulnerable HIV patients on the street were impacted on the front-end of the conspiracy, when they sold bottles supposedly containing HIV drugs out of desperation, which the Defendants bought from Khaim at dirt cheap prices. It also showed that the Defendants' sales reps were directed to target cities with high populations of HIV-positive patients, the unfortunate recipients of the Defendants' dangerous diverted drugs.

The Court should overrule the Defendants' objections and apply a four-level enhancement pursuant to USSG 3A1.1(b)(2).

IV.   **The Court Should Apply a Two-Level Enhancement Because the Defendants' Conduct Involved the Conscious and Reckless Risk of Death or Serious Bodily Injury.**

The trial evidence also proved that the Defendants' offenses involved a conscious or reckless risk of death or serious bodily injury. It was no secret that the lives of HIV patients depend on the HIV medication they take. It was also no secret that the Defendants' purchase ***and*** distribution of black-market HIV medications put countless HIV patients' lives at risk. *See* GX 646 (article shared between the Boyd brothers discussing the serious health risks posed by HIV drug diversion schemes); GX 108 (July 2018 email sent by compliance to both Defendants

16

attaching article discussing prescription diversion schemes and stating that "the wholesale drug distribution system remains vulnerable to persons willing to commit unconscionable acts affecting seriously ill patients."). The testimony of victim Gustavo Borja presented but one example of the risks and consequences of the Defendants' conscious and reckless criminal conduct. Borja testified he could not "skip any day" of his medicine and that "my viral load in my blood can go up and can pretty much kill me if I miss my pills." Tr. 09/19/2025 at 60. This testimony mirrored the statements of the Chief Medical Officer quoted in the Queens Daily Eagle article. *See* GX 646.

Beyond those serious risks, Borja also suffered additional consequences of the Defendants' conscious decision to peddle more than 20,000 bottles of black-market HIV medication while knowing the risks that posed. Indeed, on multiple occasions, the Defendants distributed bottles of HIV medication with the wrong pills inside. That happened as early as August 2020, long before Borja paid the price for their crimes. Despite that, they continued committing their despicable crimes through at least September 2021. *See* GX 97 at 20 (falsified T3 associated with Defendants' sale of diverted Synergy HIV drugs in September 2021). As he testified at trial, after unwittingly taking the Seroquel that was in his bottle of diverted HIV medication, Borja passed out and, for 24 hours, was "completely numb," unable to get out of bed, unable to speak, and had no idea what happened. Tr. 09/19/2025 at 60-61. HIV-positive victim Borja was just one of the thousands of HIV patients whose lives the Defendants consciously and recklessly risked by contaminating the supply chain of medication for HIV patients in the United States.

In *Moran*, the Eleventh Circuit affirmed application of this enhancement where there was no evidence of serious bodily injury. "Even if there is no evidence of death or serious bodily injury, the increase may nevertheless be appropriate, because the increase focuses on the defendant's disregard of risk, rather than on the result." 778 F.3d at 977

(citing *United States v. Mateos,* 623 F.3d 1350, 1371 (11th Cir. 2010). *Moran* involved the admission of "elderly patients with dementia, although the facility and staff were not equipped to meet the elderly patients' needs." *Id.*

In *Mateos*, the Eleventh Circuit affirmed application of this enhancement for a nurse who injected HIV patients with simple saline solution or a highly diluted version of the drug WinRho.[4] 623 F.3d at 1371. In so holding, the Eleventh Circuit wrote that "any injection always carries some risk of infection or other complications, and that . . . risk is especially high when the patients have HIV and weakened immune systems." *Id.* at 1354, 1371. The Court continued: "Even though there was no evidence that any patient was actually harmed from the treatments, the enhancement was nevertheless appropriate because the Guidelines provision focuses on the defendant's disregard of risk rather than on the result." *Id.* Here, the government presented evidence of actual harm to HIV patients as well as the serious risks the Defendants consciously and recklessly disregarded in pursuit of profit.

The Court should overrule the Defendants' objection and apply the enhancement, consistent with the holdings in *Mateos* and *Moran*, as well as the Sentencing Guidelines.

**V.      The Court Should Apply a Two-Level Enhancement for Sophisticated Means.**

A two-level enhancement for sophisticated means is appropriate here because the Defendants' crimes were complex, widespread, difficult to detect, spanned at least 16 months, and by their nature required sophisticated means. USSG § 2B1.1(b)(10)(C). The trial evidence demonstrated the complexity involved in each aspect of the scheme and throughout the involvement of each Defendant. This included the use of falsified documents to conceal the true

---

[4] WinRho is used to treat an immune condition, including in HIV patients. *See* https://www.winrho.com/.

origin of the black-market HIV medication they sold to pharmacies; their elaborate efforts to
conceal their crimes, including their deceitful and manipulative use of attorneys and compliance
personnel; and their lies to the FDA.

The jury convicted the Defendants of conspiracy to traffic in pre-retail medical products
with falsified documentation. Its decision was supported by the overwhelming evidence presented
at trial. To begin with, a pharmaceutical wholesale business is a sophisticated operation that is
highly regulated. Together, the Defendants obtained and maintained wholesale distribution
licenses in many states and used their licenses and falsified T3s to peddle illicit HIV drugs from
the streets all the way to pharmacies and unsuspecting consumers.

Carrying out such a massive, nationwide prescription drug diversion scheme required the
Defendants to engage in sophisticated means. The trial evidence showed how the Defendants
knowingly used falsified paperwork, required by law to be provided to pharmacies, to conceal the
black-market nature of the drugs they sold. As co-conspirator Khaim testified, Charles Boyd was
primarily responsible for helping him with Boulevard's falsified T3s:

> Q. Okay. In this case, who taught you how to make those T3s,
> pedigrees look legitimate?
>
> A. Charles Boyd.
> . . .
>
> A. Charles Boyd would go over with me and tell me exactly
> what -- everything had to do with everything, has to put line
> by line. I spoke to him on the phone multiple times, how it's
> supposed to happen.

Tr. 10/20/2025 at 133.

When it came to black-market supplier Synergy Group Wholesalers ("Synergy"), Patrick
Boyd was responsible for helping its principal create a falsified T3 that would satisfy compliance.
After compliance contacted the distributor listed on the first version of Synergy's T3, the

distributor confirmed the falsity of the document and stated it would be reporting it to the FDA. GX 243. Patrick Boyd then instructed compliance the following day to "email that person back just letting them know we were provided with incorrect information and 'have a good day'" GX 449A-C. After compliance raised concerns with Synergy's second false T3, Patrick Boyd, Charles Boyd, and Adam Brosius discussed the problem. Patrick Boyd wrote to the group: "I can call them tomorrow if Abbie can tell me the exact issues. I know we had that initial hiccup but was[n']t sure about anything else." GX 463. Charles Boyd responded: "[T]he T3 didn't go back to an AD but to a ghetto PR distributor[.] [B]etween that and lying the first time we just need to be careful[.]" *Id.* Patrick Boyd replied, "Ok got it[.]"

The following day, Patrick Boyd wrote to Divilio, "I've got to call Carlos [from Synergy] in a few, want me to just tell them we need AD t3's prior to sending a po?" GX 474. This was the same day one of Patrick Boyd's sales reps asked him if he had any "good news on the HIV/brand suppliers," and Patrick Boyd responded that he was "making progress with paperwork" and was "on a rampage with compliance to get some stuff rolling." GX 527. These documents, along with Divilio's testimony, show how Patrick Boyd dealt directly with Synergy to manufacture a third falsified T3 that would finally pass muster with compliance. After his "rampage with compliance," the Defendants went on to purchase more than $6.7 million in black-market HIV drugs from Synergy. GX 40J.

The Defendants' distribution of more than $92 million in black-market HIV drugs along with falsified documents designed to fool customers and the FDA, over an extended period of time, required a great degree of sophistication. It also required a long track record of deceit, with the Defendants concealing critical facts from their own compliance employees, salespeople, and lawyers. *See United States v. Valdes*, 2023 WL 8784706, at *3 (11th Cir. Dec. 19, 2023)

("Repetitive and coordinated conduct can be a sophisticated scheme even when no one step is particularly complicated. When a large amount of money is stolen gradually and the fraud is not discovered over a long period, the length of time for which the conduct is not detected can reflect the sophistication of the scheme.") (citations omitted).

The sophistication of the Defendants' crimes was also made evident through the testimony of Nicole Wolfe, a representative of the drug manufacturer ViiV. Wolfe's testimony demonstrated the difficulty of detecting the Defendants' crimes. She explained how she needed to review each individual T3 and cross-reference her company's sales records to confirm each T3 accompanying the hundreds of bottles of ViiV medication the Defendants sold was falsified:

> Q. Okay. And, again, I won't make you go through each one of these, but did you go through each one of these yourself?
>
> A. Each of the T3s?
>
> Q. Yes. Have you looked at this exhibit before and verified that these are each false?
>
> A. Yes.
> …
>
> Q. And were you able to look into the different reference numbers and determine if these products were sold as it's represented in these T3 documents?
> . . .
>
> Q. Okay. So you could not find one match. Does that mean your conclusion was that the information reflected was not true?
>
> A. Correct.
>
> Q. Okay. And there's quite a few of those T3s, aren't there?
>
> A. Yes.
>
> Q. I'm showing you, I think, 87 different pages, each one a T3. Does that sound about right?

A. Yes.

Tr. 10/07/2025 at 99; 97; 93.

Furthermore, both Patrick and Charles Boyd engaged in sophisticated means to conceal their conduct from discovery by enlisting attorneys early on. As with their own employees, the Defendants concealed material facts from, misled, and lied to their attorneys, all so they would get advice favorable to them. By doing so, the Defendants also prevented many of their lies from being discovered for years. One of those attorneys, Martha Rumore, represented Safe Chain during the conspiracy and testified at trial. The documents admitted, combined with her testimony, demonstrated how the Defendants' use of an attorney was a complex and sophisticated way to cloak their wrongdoing in privilege. As Dr. Rumore testified:

> Q. Dr. Rumore, now that you have seen additional documents, do you feel like you were deceived?
>
> A. I feel like information was concealed from me, and that maybe I was even manipulated into providing advice for whatever reason, you know, the whole situation wasn't disclosed to me.

Tr. 09/30/2025 at 133.

Dr. Rumore also confirmed that the Defendants' lies and omissions were important. This notion was echoed throughout her two days of testimony:

> Q. Ms. Rumore, is it safe to say you've seen a lot of new information today that you didn't have back in 2020 or 2021?
>
> A. Yes.
>
> Q. And you heard me ask you over and over again about different evidence. Would this have been important to you? Do you remember all those questions?
>
> A. Yes.
>
> Q. After seeing the evidence that you have seen today, would

22

you have responded differently to the FDA if you knew
everything that you have seen today?

A. Yes.

Q. Would you have responded differently to Gilead if you saw
everything that you have seen today?

A. Absolutely, yes.

Q. And would you have agreed to continue representing and
defending Safe Chain if you knew and saw what you've seen
today?

A. I would not have continued if there was something that --
all of this that I wasn't aware of, it's a different -- it's a
different matter. It wouldn't be something that I could
handle.

Tr. 09/25/2025 at 201.

While Charles Boyd primarily dealt with the attorneys, the government also introduced
evidence of Patrick Boyd lying to their attorneys. In an April 2021 email, Patrick Boyd claimed to
Rumore and other attorneys that "[w]e have only had issues with Gilead products from these
vendors, no other medications in any instance, branded or generic[.]" GX 320. This was a blatant
lie, as the trial evidence showed both Defendants knew prior to this email that they had distributed
bottles of Janssen and ViiV products that had the wrong pills inside, were unsealed, or had other
evidence of tampering/diversion. *See, e.g.*, GX 196 (email to both Defendants about a Janssen
product with the wrong drug inside); GX 353 (May 2020 bottle of ViiV product with Albuterol
foil under the cap); GX 307 (March 2021 email regarding Janssen products returned due to
damage/dirty labels). And Patrick Boyd was copied on Charles Boyd's April 12, 2021 email to the
attorneys where he misled them about Synergy, hoping to get a legal stamp of approval to continue
buying black-market drugs from Synergy after it had already provided two falsified T3s, facts he
conveniently omitted. GX 269.

In addition to lying to and withholding information from their attorneys, the Defendants also engaged in a similar pattern of deception with their employees and customers. For instance, evidence presented at trial proved that Patrick Boyd concealed the many issues with bottles of medication from his salespeople so they would continue selling the black-market HIV medication. As one of those sales reps, Jonathan Nicholls, testified:

> Q. Do you remember if Patrick Boyd ever told you about products that Safe Chain was selling from Gentek having the wrong pills inside the bottles?
>
> A. No, ma'am.
>
> Q. Do you remember if Charles Boyd ever told you that bottles of medication from Gentek that you were selling had the wrong pills in the bottle?
>
> A. No, ma'am.
>
> Q. Would you have wanted to know that information?
>
> A. Yes, ma'am.

Tr. 09/18/2025 at 225.

Finally, after Gilead sent out an alert to pharmacies regarding Safe Chain's unlawful distribution of diverted and unsafe bottles of its HIV medication, the Defendants crafted a letter to customers full of lies and misleading statements, hoping to retain as much business as possible. Patrick Boyd sent a copy of this letter to his sales reps and tried to shift blame onto Gilead for the issues with the black-market drugs he and his brother sold. GX 249. The letter was a continuation of both Defendants' long pattern of deceit and concealment. Among the many misrepresentations and misleading statements in this March 17, 2021 letter are the following: (a) "The products in question, and all products that are distributed by Safe Chain, have proper T3 documentation tracing the products back to the manufacturer or their Authorized Distributor"; (b) "As of late 2020, Safe Chain no longer sources any products from Gentek LLC and has had no other similar issues since

24

then"; (c) "Safe Chain follows all laws and compliance protocols required by the Drug Supply Chain Security Act"; and (d) "Safe Chain immediately flagged the associated product lot numbers and quarantined any remaining product that had the same NDC and lot numbers. Safe Chain also refused any future units reflecting said lot numbers." Each statement was proven to be a lie through Divilio's testimony and admitted exhibits. Beyond these lies, Divilio also recounted the myriad other ways in which both Defendants deceived and manipulated her, in a concerted effort to obtain her approval and give their business the façade of legitimacy.

The Court should overrule the Defendants' objections and apply the two-level sophisticated means enhancement.

**VI.    The Court Should Apply a Four-Level Enhancement Because the Offenses Involved Conduct Described in 18 U.S.C. § 670 and the Defendants Were Agents of an Organization in the Supply Chain For Pre-Retail Medical Products.**

Pursuant to USSG. § 2B1.1(b)(8)(B), a four-level enhancement applies if (a) the offense involved conduct described in 18 U.S.C. § 670, and (b) the defendant was employed by, or was an agent of, an organization in the supply chain for the pre-retail medical product. Charles Boyd does not object to this enhancement. ECF No. 268. Patrick Boyd does, but only to the additional two-level enhancement for being an agent of an organization in the supply chain for pre-retail medical products. He argues the enhancement does not apply because a jury must specially find that he was an employee or agent of his company, and that it should not apply because he did not abuse his company's trust. No such requirements exist in the Guidelines. No special verdict was necessary because application of this enhancement does not require a specific jury finding.[5] As the Court is

_____

[5] The government does concede that a special verdict form was likely required to increase the statutory maximum penalty for the Defendants' convictions on Count 4 (18 U.S.C. § 670). That does not impact the application of this enhancement, which the Court may apply based on the trial evidence.

aware, application of an enhancement under the Sentencing Guidelines is determined by the Court and only requires proof by a preponderance of the evidence, not beyond a reasonable doubt. *United States v. Hamaker*, 455 F.3d 1316, 1336 (11th Cir. 2006).

Setting this aside, the government proved at trial that both Defendants were agents of a company in the supply chain for pre-retail medical products. Although not defined in the Sentencing Guidelines, it is well-settled that a part-owner of a company is an "agent" of the company. An agent is "[s]omeone who is authorized to act for or in place of another; a representative." Black's Law Dictionary (11th ed. 2019). "To qualify as an agent of an entity, an individual need only be authorized to act on behalf of that entity." *United States v. Keen*, 676 F.3d 981, 990 (11th Cir. 2012). The Eleventh Circuit Pattern Jury Instructions define "agent" similarly. *See* 11TH CIRCUIT PATTERN JURY INSTRUCTIONS O24.1; O24.2. There is no question that Patrick Boyd, who supervised dozens of employees and managed the entire sales division, was authorized to act on behalf of Safe Chain.

Patrick Boyd nevertheless seems to argue that an owner of a company is somehow not an agent of the company, and therefore the additional two-level enhancement should not apply here. It defies logic to suggest that a greater enhancement applies only to mere employees of companies in the pharmaceutical supply chain but not the owners.

The commentary to Amendment 772, which added this enhancement, makes this purpose clear:

> The amendment provides a 4-level enhancement for defendants who commit such offenses while employed in the supply chain for the pre-retail medical product. Such defendants are subject to an increased statutory maximum and **the Commission determined that a heightened enhancement should apply to reflect the likelihood that the defendant's position in the supply chain facilitated the commission or concealment of the offense**.

United States Sentencing Commission, Amendment 772, effective November 1, 2013. (emphasis added).

Patrick Boyd held a position in the supply chain as an owner, operator, and individual who acted on behalf of a company in the pharmaceutical supply chain. Ample evidence at trial made clear that his position facilitated the commission and concealment of the offense because he and his brother sold the medication through their licensed distributor.[6]

## VII.    The Court Should Apply a Four-Level Role Enhancement For Patrick Boyd.

The Court should apply a four-level enhancement based on Patrick Boyd's significant role in the conspiracies pursuant to USSG § 3B1.1(a). While Charles Boyd does not object to the application of this enhancement, Patrick Boyd asserts there was no evidence he "organized anything other than pill bottles in a large box" and describes his involvement as "very limited." ECF No. 269 at 11-12. Unfortunately for him, the trial evidence contradicts these wild claims. Patrick Boyd, like his brother and co-founder, was an organizer and leader of the extensive, nationwide criminal conspiracies that involved numerous participants and unwitting sales employees.

Patrick Boyd was a part-owner, Managing Partner, and head of Safe Chain's entire sales team. Like Adam Brosius (who received a four-point role enhancement), Patrick Boyd led and

---

[6] In the event the Court disagrees, then it should instead apply a two-level enhancement pursuant to USSG § 3B1.3 because both Defendants abused a position of public trust by corruptly contaminating the supply chain for life-saving prescription HIV drugs. Both Defendants exercised significant discretion and the public relies on pharmaceutical wholesalers to distribute legitimate, safe versions of their prescription medications. The Eleventh Circuit has affirmed application of this enhancement in the case of a licensed pharmacist. *See United States v. Mekowulu*, 556 F. App'x 865, 869 (11th Cir. 2014) (finding that "a licensed pharmacist does exercise discretion when faced with indicators of drug diversion"). Patrick and Charles Boyd both occupied positions of public trust greater than that of a pharmacist and exercised more discretion as the owners and CEO of a wholesale distributor.

directed his own sales team. His leadership of that sales team is how many of the diverted HIV drugs made their way to pharmacies and into patients' hands. Similarly, witnesses testified, corroborated by documents, that he handled and knew about many customer complaints regarding the bottles of diverted drugs the Defendants sold. He also worked closely with Charles Boyd when such complaints arose. *See, e.g.*, GX 4 (text messages between the Boyd brothers about a patient opening a bottle with the wrong medication inside, with Patrick Boyd writing, "Maybe we go on the offensive"). During the planning stages of their criminal conduct, Patrick Boyd forwarded an email to his sales team with information and directions on selling the diverted HIV drugs. GX 118 (Patrick Boyd instructing his sales team to "[s]tudy up cause if you have questions, tomorrow is the time to ask!!!!!!"); *see also* GX 507 (Patrick Boyd writing in July 2020, "I know the hiv guys pretty well"). He also directed his sales reps to prioritize selling Boulevard HIV drugs and lie to customers when needed. *See* GX 431 at 2; GX 524 at 2. This, along with all the other trial evidence, amply demonstrated that Patrick Boyd was directly involved in the "planning or organizing [of] the offense." USSG § 3B1.1 comment. note 4.

Patrick Boyd's role in appeasing unhappy or suspicious customers was integral to the success of the criminal conspiracy because he, in some cases, convinced customers to continue purchasing from the Defendants. For example, one of his subordinates, Jonathan Nicholls, testified that Patrick Boyd was responsible for communicating directly with customers who complained about the unsafe, diverted product the Defendants sold them:

> Q. Okay. And did you tell Charles Boyd and Patrick Boyd that Emil, the owner of Olympia Pharmacy, was complaining about not getting pedigrees?
>
> A. Well, Patrick Boyd. He was the sales manager at the time.

Tr. 09/18/2025 at 207.

28

Additionally, Nicholls testified to his conversations with Patrick Boyd about how to respond to customer complaints about the dirty bottles of medication they received. *See id.* at 195. Nicholls further testified about Patrick Boyd's role planning and organizing the conspiracies by controlling the pricing his sales reps could offer for the diverted HIV drugs, re-emphasizing his leadership role in pushing these dangerous black-market drugs into pharmacies and patients' hands:

> Q. Okay. And did you offer different pricing for bottles of medication based on whether or not it had a pedigree?
>
> A. We were told that we could do so; yes, ma'am.
>
> Q. And who told you that?
>
> A. Patrick Boyd.

*Id.* at 198. *See also* GX 217 (email from Patrick Boyd to sales reps attaching a spreadsheet with "NEW WAC PRICING" the reps could offer customers).

Numerous trial exhibits similarly showed how Patrick Boyd played a pivotal role handling customer concerns about the diverted HIV medications, discussing the issues with the medication internally, and instructing salespeople on how to respond. *See, e.g.,* GX 420; GX 431; GX 517 (Olympia Pharmacy complaint); GX 182 (Olympia); GX 183 (Olympia); GX 203; GX 269; GX 273; GX 320; GX 322; GX 324; GX 420; GX 174; GX 182; GX 320.

In addition to his leadership of Safe Chain's sales team, a four-point leader/organizer enhancement should be applied here because it is indisputable that his offense conduct was "otherwise extensive" and involved at least five black-market suppliers. As discussed above in the context of the sophisticated means enhancement, Patrick Boyd was responsible for working with and assisting Synergy in manufacturing false T3s that would satisfy his worn-down compliance employees. While Charles Boyd primarily oversaw compliance, this was an example where Patrick

Boyd went "on a rampage with compliance to get some stuff rolling." GX 527. He was successful in "get[ting] some stuff rolling," because he and his brother then went on to buy and re-sell more than $6.7 million in diverted drugs from Synergy. GX 40J. Similarly, around the same time, he pushed compliance to approve other vendors for non-Gilead drugs, despite the fact that they had already provided falsified T3s. GX 477 (after AmerisourceBergen confirmed Cintex was not a customer, Patrick Boyd wrote to Divilio: "I think our responses to these people should be along the lines of 'being the AD didn't confirm your account we can not buy gilead brand products . . . from you. However if you have other products with t3's to an ad we are happy to approve'").

Aside from his co-conspirators, the number of salespeople under Patrick Boyd's supervision further supports application of the enhancement. While not criminals like the Boyds, Patrick Boyd's sales team helped him carry out his crimes by taking direction from and acting on his directives. *See* USSG. § 3B1.1(a) and cmt. 3 ("[A] fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive."); *United States v. Copeland*, 2026 WL 73208, *5 n.2 (11th Cir. Jan. 9, 2026) ("[A] fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive.") (citation omitted).

Courts have consistently applied role enhancements where defendants led or supervised significant aspects of health care and other white-collar fraud schemes. *See, e.g.*, *United States v. Slaughter*, 298 F. App'x 876, 877 (11th Cir. 2008) ("Because Slaughter caused a principal loss of over $5.5 million and involved many knowing and unknowing individuals in his criminal activity, the district court did not err in finding that he was a leader and organizer of a criminal activity that was 'extensive.'"); *United States v. Sosa*, 777 F.3d 1279, 1301-02 (11th Cir. 2015) (in health care

fraud case, use of a dozen patients, use of outside billing company, and falsification of records rendered fraud "otherwise extensive" for purposes of role enhancement).

The Court should overrule Patrick Boyd's objection, which completely misstates the trial evidence, and apply a four-point role enhancement.

### VIII. The Court Should Apply a Two-Level Enhancement Because the Defendants Obstructed and Impeded Justice

#### A. Defendant Charles Boyd Willfully Obstructed and Impeded the Administration of Justice

The PSR correctly applies a two-level enhancement to Charles Boyd's Guidelines calculations pursuant to USSG § 3C1.1. This provision applies where

> the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense[.]

Application Note 4 contains a non-exhaustive list of covered conduct, which includes "committing . . . perjury, including during the course of a civil proceeding if such perjury pertains to conduct that forms the basis of the offense of conviction." During trial, the government introduced excerpts of each Defendant's sworn deposition testimony from Gilead Sciences' civil case that was focused on much of the same conduct as the criminal case. These depositions took place in June 2023, long after the government opened its investigation and after the Wall Street Journal published an article specifically mentioning Safe Chain in the context of its reporting on the Justice Department's investigation into a massive drug diversion scheme involving the Defendants.[7] The government also introduced documents proving that each Defendant lied during

---

[7] According to the article, "Safe Chain declined to comment," demonstrating their knowledge of the Justice Department's investigation. While it is not necessary to prove a defendant's knowledge

their civil depositions.

As to Charles Boyd, the government introduced an excerpt where Charles Boyd testified under oath that King Kimchi and Peter Khaim "were two separate people" and that he "did not speak to King Kimchi on the phone. That sworn testimony was directly contradicted by several emails and text messages Charles Boyd wrote. On August 10, 2020, Charles Boyd introduced consulting012345@gmail.com (King Kimchi's email address) to another individual as "Peter who owns Boulevard Wholesale." GX 343. That same day, "King Kimchi" responded to Charles Boyd's introductory email. GX 136. Later that same month, on August 27, 2020, "King Kimchi" sent T3s to compliance listing Safe Chain's Utah address. GX 349. Charles Boyd responded to his employees: "I'm not sure why our UT facility is on there but will tell **him** [King Kimchi] to fix it." *Id.* (emphasis added). That same day, Charles Boyd sent a text message to Peter Khaim: "Hey Peter, all of the T3s have our Utah address on them and they need our Maryland address. Can you please fix?" GX 503 at 35. On September 11, 2020, Charles Boyd sent a text message to Khaim: "What's your email?", to which Khaim responded: "Consulting012345@gmail" – the King Kimchi email address that went on to send numerous false T3s to Charles Boyd and compliance throughout the conspiracy. *See id.*; GX 181 (October 2, 2020 email from compliance to King Kimchi and Charles Boyd); GX 184 (October 5, 2020 email from compliance to King Kimchi and Charles Boyd); GX 186 (October 6, 2020 email from King Kimchi to Charles Boyd and others). The same day as the October 5, 2020 email cited above, Charles Boyd texted Peter Khaim, "Any updates on the paperwork," and Khaim replied, "Yes I sent one to Abbie just wanna know if it's good to go." GX 503 at 56-67. Khaim then sent additional follow-up text messages to Charles

---

of a criminal investigation under the plain terms of this example under Application Note 4, such knowledge reinforces the applicability of the enhancement here.

Boyd on October 6, 2020 (same date as GX 186, above), including one in which Khaim wrote: "Sent all the paperwork." Khaim testified he was King Kimchi, that he created the consulting012345@gmail.com email address, and confirmed many of the same facts shown through these documents. *See, e.g.*, Tr. 10/07/2025 at 177-78.

All these documents directly contradict Charles Boyd's sworn testimony, prove he knew Peter Khaim and King Kimchi were the same person, and demonstrate that he lied under oath to avoid incriminating himself by admitting he knew Khaim and King Kimchi were the same person.

## B. Defendant Patrick Boyd Also Willfully Obstructed and Impeded the Administration of Justice

As with Charles Boyd, the government introduced excerpts of Patrick Boyd's sworn deposition testimony in Gilead's civil case. In one such excerpt, Patrick Boyd was asked about his understanding of WAC during the time period of the conspiracies. GX 71. Patrick Boyd responded that he had "no understanding of it whatsoever since we weren't in the branded space." *Id.* An understanding of WAC was important to both the civil and criminal cases, because it was relevant to the extremely low pricing at which the Defendants bought the diverted HIV drugs. Admitting to understanding WAC, then, would tend to incriminate Patrick Boyd.

The government then introduced emails directly contradicting Patrick Boyd's sworn testimony. In one such email, Patrick Boyd wrote about WAC in the context of HIV drugs in January 2016, prior to his sworn testimony above:

All,

[T]hese are some specialty products I can get for under WAC that are great for hospitals and/or specialty pharmacies. I need to know asap if its stuff we can move or I have to . . . pass the opp to another distributor who will likely be our direct competition.

SCS cost is what the company pays, we'd like to see markup ups (sic) of 15-20%+ but if we're getting paid upfront we can take a little less and use these as 'account

builders.'

Thanks

GX 103. An employee of the Defendants responded, copying Patrick Boyd, with the subject line "Discounted Products – HIV Drugs," and attached a spreadsheet listing various HIV drugs with each drug's WAC and the discounted pricing at which Safe Chain could obtain the drugs. This email directly contradicts Patrick Boyd's sworn testimony and proves that he, like his brother, lied under oath, justifying application of this enhancement. The government also introduced another email that Patrick Boyd forwarded in March 2016, with the subject line "FW: HIV prices" and an attachment named "HIV MASTER LIST DO NOT SEND.xlsx." GX 104. The attachment identified numerous HIV drugs, their discounted costs and sales prices, and the associated sales margin (30%). *Id.* at 2-3. While not explicitly discussing WAC, this email is additional proof that Patrick Boyd understood the branded space, knew about WAC, discounts off WAC, and how profitable this line of business could be.

Patrick Boyd objects to this enhancement on the bases that "[t]here is no evidence that Patrick Boyd was aware of any DOJ investigation into his actions" and "there is no evidence that his statement was intended to obstruct or impede that investigation in any way." As discussed above, nothing in Application Note 4(B) provides that a defendant has to be aware of an ongoing criminal investigation; rather, it is focused on committing perjury "during the course of a civil proceeding if such perjury pertains to conduct that forms the basis of the offense of conviction." Gilead's civil case and Patrick Boyd's false denial regarding WAC "pertain to conduct that forms the basis of the offense of conviction." Nevertheless, Patrick Boyd's knowledge of an ongoing investigation into him and his company is supported by the fact that (a) the WSJ article discussed above was published more than a year before he was deposed; (b) it specifically mentioned Safe

Chain in the context of a DOJ investigation; (c) the WSJ reached out to Safe Chain for comment; and (d) Safe Chain declined to comment.

**IX.    Sentences in Other Health Care Fraud Cases Show Why a Substantial Term of Imprisonment is Appropriate Here.**

As the lengthy discussion above demonstrates, the Defendants' crimes were complex, sophisticated, and especially egregious. Courts in this district have handed down lengthy post-trial sentences in cases where defendants did not display the conscious disregard for human life the Defendants did here. For example, in *United States v. Patel*, Judge Ruiz sentenced a defendant convicted at trial to 27 years in prison for his leadership role in a genetic testing fraud case with actual losses of $187 million and no evidence of patient harm. Case No. 19-cr-80181 (S.D. Fla. 2023).

In other cases involving vulnerable victims and actual or potential patient harm, judges have justifiably imposed significant sentences. In the Biscayne Milieu case, Judge Scola sentenced defendant Antonio Macli to 30 years' imprisonment and Jorge Macli to 25 years' imprisonment. *Moran*, 778 F.3d at 953-55. These defendants carried out a $57.7 million health care scheme involving a partial hospitalization program for mental illness. A. Macli was the CEO and J. Macli was the day-to-day manager. *Id.* The defendants' scheme took advantage of addicts to make money, and "failed to provide meaningful treatment for substance abuse." *Id.* at 952. In the Hollywood Pavilion cases, Judge Martinez sentenced defendant Karen Kallen-Zury to 25 years' imprisonment in a $67 million health care fraud case where Kallen-Zury co-owned and operated Hollywood Pavilion. There, drug addicts were recruited and bused down to Miami so that the defendant could fraudulently bill Medicare for psychiatric services these individuals did not need.

Finally, the defense points to co-conspirator Lazaro Hernandez's sentence of 15 years as justification for lower sentences here. Undersigned counsel prosecuted Lazaro Hernandez and

handled his sentencing. While true that Hernandez faced two indictments, he pleaded guilty in both cases, expressed remorse, and cooperated, leading to charges against his partners-in-crime and others. Hernandez was also sentenced at a Criminal History Category I, not II, as Charles Boyd inaccurately states. *United States v.* Hernandez, No. 22-cr-60129, ECF No. 92 (Sent. Tr. at 63) (S.D. Fla. 2023) ("I'm still counting you as criminal history I").[8] Further differentiating that case, there was no evidence of actual patient harm at the time of his sentencings, as there is here. Finally, during sentencing the judge noted one "advantage" Hernandez had in his case: "[Y]ou literally have the most lenient sentencing judge in the district[.]"  Had Hernandez's case been in front of certain other judges in this district, the sentencing judge told him he would "be dying in prison" or "dying in prison twice." *Id.*

## **CONCLUSION**

For the foregoing reasons, the United States requests that the Court overrule the Defendants' objections and adopt the PSR's Guidelines calculations, with the exception of applying both the abuse of trust enhancement and the additional two-level increase under USSG § 2B1.1(b)(8)(B). Like the district court judges in *Patel*, the Biscayne Milieu case, and the Hollywood Pavillion cases, the Court should sentence each Defendant to a substantial prison term measured in decades.

The United States further recommends that the Court order a forfeiture money judgment in the amount of $21,850,000 as to each Defendant, as requested in the government's forfeiture motions. ECF Nos. 245-46.

---

[8] It also bears noting that Hernandez's loss calculation in the 2022 case was calculated using the same methodology employed here: The amount he and his co-conspirators' companies were paid for the drugs.

Respectfully submitted,


JASON A. REDING QUIÑONES
UNITED STATES ATTORNEY

By:     */s/ Alexander Thor Pogozelski*
         Alexander Thor Pogozelski
         Jacqueline Zee DerOvanesian
         Assistant United States Attorneys
         Florida Special Bar No. A5502549
         Florida Bar No. 125662
         99 Northeast 4th Street
         Miami, Florida 33132
         Tel: (786) 649-5251 (Pogozelski)
         Tel: (305) 961-9349 (DerOvanesian)
         Email: Alexander.Pogozelski@usdoj.gov
         Email: Jacqueline.Derovanesian@usdoj.gov




## <u>CERTIFICATE OF SERVICE</u>

I, Alexander Thor Pogozelski, hereby certify that on March 11, 2026, I electronically

filed the foregoing document with the Clerk of the Court using CM/ECF.


                    */s/ Alexander Thor Pogozelski*
                    Alexander Thor Pogozelski

37