**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 24-CR-20255-WPD**

**UNITED STATES OF AMERICA**

**v.**

**CHARLES BOYD,**

**Defendant**.

_____/

## CHARLES BOYD'S SENTENCING MEMORANDUM INCORPORATING OBJECTIONS TO SENTENCING GUIDELINE CALCULATIONS AND APPLYING 18 U.S.C. §3553(a) FACTORS

Dated: March 11, 2026

**By: s/ Bruce A. Zimet, Esq.**
Florida Bar No. 0225053
**BRUCE A. ZIMET, P.A.**
1555 Palm Beach Lakes Blvd., Suite 1400
West Palm Beach, FL 33401
Tel: (561) 508-7741
Tel: (954) 764-7081
Email: BAZ@BruceAZimetLaw.com
*Counsel for Charles Boyd*

## <u>TABLE OF CONTENTS</u>

I.     **INTRODUCTION**................................................................................3

II.    **SENTENCING GUIDELINE CALCULATIONS** ............................................4

    A. Objections to Pre-Sentence Report Guideline Calculation**s** .............................4

       1.  Additional Facts to be Added to PSR ...........................................4

       2.  Loss Amount PSR Objections...................................................8

III.   **18 U.S.C. §3553(a) FACTORS**................................................................9

    A. Nature and Circumstances of the Offense and the History and Characteristics
       of the Defendant....................................................................9

    B. Need to Sentence to Reflect the Seriousness of the Offense, Promote
       Respect for the Law, and Provide Just Punishment .......................................17

    C. Need for Sentence to Afford Adequate Deterrence.....................................18

    D. Need to Protect the Public from Further Crimes of the Defendant................................18

    E. Need for Sentence to Provide the Defendant with Needed Educational or Vocational
       Training, Medical Care, or Other Correctional Treatment in the Most
       Effective Manner ..................................................................18

IV.    **GROUNDS FOR DOWNWARD VARIANCES** ...........................................18

    A. The Guideline Calculation Overstates the Seriousness of the Offenses ........................18

    B. A Downward Variance is Necessary to Avoid Unwarranted Sentence Disparity ...........20

    C. Charles Boyd's Pre-Indictment Payments to Gilead......................................23

    D. Charles Boyd's Extraordinary Charitable and Philanthropic History............................23

V.     **CONCLUSION** ................................................................................27

**CERTIFICATE OF SERVICE** ...................................................................29

## I.  <u>INTRODUCTION</u>

For Charles "Charlie" Boyd, 2026 should be a year marked by professional and personal achievement in continuation of what most would describe as fulfillment of the American Dream. Instead of joining with his high school sweetheart and celebrating twenty years of marriage, mentoring two vibrant sons as they race their way into adulthood, directing a flourishing business he helped start from scratch, and continuing his addiction to philanthropic activities, Charlie finds himself a defendant awaiting sentencing before this Court. Charlie, the faith based eternal optimist, the kid who overcame his learning disabilities with perseverance and hard work, the man who not only preached, but actually lived by the principle of giving and helping others, recognizes his mistakes and judgement errors that resulted in his conviction on seven of eight counts of his HIV drug diversion Indictment. Charlie, while disagreeing, understands and respects the jury's verdict.

Charlie's Sentencing Memorandum is not excuse based, despite the presence of obvious "low hanging" circumstances and candidates that Charlie could point towards. Nor will Charlie's Sentencing Memorandum engage in the "blame game" that avoids personal responsibility and deflects it to others. That is not part of Charlie's "DNA". This Sentencing Memorandum will attempt to pull back the curtain and allow the Court to appreciate who Charlie is while more fully understanding the conduct that resulted in Charlie being a criminal defendant in this case.

The Sentencing Memorandum will follow the procedure set forth in the recently amended §1B1.1 of the Sentencing Guidelines. Initially, Charlie will address the appropriate Sentencing Guideline offense level, by reasserting objections to the Pre-Sentence Report's conclusions, advocating that Charlie's offense characteristics, other than acceptance of responsibility and loss amount, should be identical to those of co-defendant Adam Brosius. In addition, as to "loss

amount" Charlie will argue that "credit" should be given for the value of the "buy back" HIV drugs Charlie's company, SafeChain, sold to pharmacies.

The Sentencing Memorandum will then address each of the sentencing factors set forth in 18 U.S.C. §3553(a) as they relate to Charlie. Those factors will assist in formulation of the grounds for downward variances including, the Sentencing Guideline calculations overstating the seriousness of the offense, the need for the sentence parity particularly for defendants convicted in similar HIV diversion cases, the need for sentence to reflect Charlie's role played in the black-market buy back scheme, preindictment payment of approximately $2.7 million dollars to HIV drug Manufacturer Gilead, and a lifetime commitment to charity and philanthropy.

Ultimately, Charlie's Sentencing Memorandum will request a sentence that is sufficient but not greater than necessary to achieve the purposes of §3553.

## II. SENTENCING GUIDELINE CALCULATIONS

### A. Objections to pre-sentence report guideline calculations

Charlie submitted his comments and objections to the Pre-Sentence Report ("PSR") Sentencing Guideline calculations to the Probation Office on February 13, 2026. That correspondence was filed with the Court on that date. (D.E. 268). Charlie has not received a revised PSR addressing the February 13, 2026 comments and objections. Charlie deferred presentation of facts to be included in the "Offense Conduct" section of the PSR until submission of his Sentencing Memorandum. Charlie requests the following facts be added to the PSR:

#### 1. Additional Facts to be Added to PSR

    a. Co-defendant Adam Brosius was introduced to SafeChain as an individual who could expand the SafeChain wholesale distribution business model based on his experience and contacts in the pharmaceutical industry. Brosius proved to be a

beneficial source of new business for SafeChain. In 2020, Brosius presented SafeChain with the opportunity to enter into the purchase and sale of HIV drugs. Brosius represented that he had contacts from whom SafeChain could purchase the HIV drugs which SafeChain, based on being licensed in forty-seven (47) states, could then sell to pharmacies around the United States. Brosius bought an ownership interest in SafeChain. HIV drugs that SafeChain purchased from entities brought to SafeChain by Brosius were subsequently sold to pharmacies. Brosius through his own company World Wide Pharma Sales Group, Inc. d/b/a Pharmasales.com, received 75% of the gross revenues of those sales. The remainder of the revenues covered SafeChain overhead, with Charlie ultimately receiving approximately one million dollars from the SafeChain HIV sales.

b. Between April of 2020 and August 2021, Brosius introduced SafeChain to five companies that were sources of HIV drugs. Those companies were Boulevard, Gentek, Synergy, Omom, and Rapid's Tex Wholesale Corp. Each of the five companies sold HIV drugs to SafeChain, which SafeChain subsequently sold to pharmacies. SafeChain's compliance department determined that each of the HIV companies was state licensed to sell the HIV drugs to SafeChain. In March 2021, SafeChain's compliance department determined that Boulevard had presented false documentation concerning its state licensing in April 2020 when SafeChain originally approved Boulevard as an HIV drug source. SafeChain voluntarily terminated its business relationship with Boulevard and Gentek in the Spring of 2021 based on determination that the companies had made false representations to SafeChain.

c.  Each of the five HIV "source" companies received their drugs from what is commonly known as the "Black-Market." None of the five companies disclosed to Charlie that the HIV drugs SafeChain was purchasing were "Black-Market" drugs entering the supply chain. Each of the five companies falsely claimed that the HIV drugs their company was selling to SafeChain were authentic, manufactured drugs that were part of the legitimate supply chain.

d.  Boulevard, which sold the largest quantity of HIV drugs to SafeChain, falsely claimed that the HIV drugs Boulevard was selling to SafeChain had been purchased by Boulevard at discounted prices from pharmacies that, due to Covid and other circumstances, had experienced financial distress or gone out of business. Gentek and the other HIV companies falsely represented to SafeChain that the HIV drugs being sold to SafeChain had been purchased by the respective companies at discounted prices from authorized distributors of the HIV drug manufacturer Gilead, or directly from Gilead.

e.  Gilead filed a civil lawsuit in the Southern District of Florida in November 2020 that identified a buy-back scheme wherein Gilead manufactured HIV drugs that had been provided to clinics that were then being diverted or bought back from HIV patients and then resold into the Black-Market.

f.  Charlie and SafeChain's compliance department communicated with Gilead beginning in August 2020 concerning a variety of issues involving Gilead manufactured HIV drugs and SafeChain. During the time of those communications Gilead never informed SafeChain that Gilead believed that the

HIV drugs SafeChain was selling were Gilead HIV drugs that had entered the Black-Market, primarily through buy-back schemes.

g.   SafeChain had retained a prominent law firm in 2020 that provided legal advice to SafeChain. When SafeChain received a subpoena in May 2021 from Gilead's Southern District of Florida civil buy-back case, the law firm informed SafeChain that the law firm had been monitoring the status of the Southern District of Florida case and that the case had nothing to do with SafeChain. At no time did the law firm inform SafeChain that it appeared to the law firm that SafeChain was receiving and selling Black-Market HIV drugs, or that SafeChain should investigate whether SafeChain was transacting in Black-Market drugs.

h.   Gilead filed a civil lawsuit in the Eastern District of New York in July 2021 naming SafeChain, Charlie, Patrick Boyd, Adam Brosius, and many others relating to the sale of Gilead manufactured HIV drugs that had entered into the Black-Market. Various amendments to the Gilead lawsuit have set out the actions of numerous participants in the sourcing, selling and distribution of Gilead manufactured HIV drugs in the Black-Market.

i.   Included in the Gilead lawsuit are persons described as "Kingpin Defendants", "Leader Defendants", "Supplier Defendants", and other various titles that refer to what Gilead assigned each by their role in the scheme.

j.   SafeChain, Charlie and Patrick Boyd settled the Gilead civil lawsuit in the amount of approximately $2.7 million dollars in 2024 prior to the instant Indictment. Of that settlement amount, SafeChain paid $1,925,160.35, Charlie

(and his wife) paid $727,317.38, and Patrick Boyd paid $77,633.58. To date, Adam Brosius has failed to pay any money to Gilead and a Certificate of Default has been entered against Brosius and his company World Wide Pharma Sales Group Inc. d/b/a Pharmasales.com by the Court on February 5, 2026. (**Attached as Exhibit "A"**).

**2. Loss Amount PSR Objections**

Charlie also adopted the objections set forth in the Objections to Pre-Sentence Investigation Report filed by Co-Defendant Patrick Boyd. (D.E. 269). One of Patrick Boyd's PSR Objections requires particular attention. That objection relates to the calculation of loss and is based on the Eleventh Circuit's decision in United States v. Campbell, 765 F.3d 1291, 1302 (11th Cir. 2014) (D.E. 269 at 7). Essentially Patrick Boyd, relying on Campbell, argued that any loss must be offset by the "fair market value…of the services rendered" to a victim. In Charlie's case, which involved the sale of legitimate HIV drugs that allegedly had been "bought back" from pharmacies and others, the alleged victims who purchased the HIV drugs from SafeChain received the actual manufactured HIV drugs. In that case, based on Campbell, the fair market value of the HIV drugs should be included as an offset in any loss amount calculations.

Since the Government has alleged that the Wholesale Acquisition Costs ("WAC") amount represented the fair market value of the HIV drugs, the WAC value of the HIV drugs should be an offset in loss calculations. In Charlie's case, the fair market value of the HIV drugs exceeded any amounts received by SafeChain. Under these circumstances, the loss amount should only include the instances in which actual manufactured HIV pills were not transacted. Charlie had no knowledge that the HIV bottles had ever been opened and that wrong pills had been placed inside the HIV bottles. Charlie's jury specifically declined to determine that Charlie had involvement in

a conspiracy relating to adulterated drugs as alleged in Count I of the Indictment. Charlie's loss amount should be limited to the approximate ten (10) HIV bottles in which wrong pills have been identified.

### III. 18 U.S.C. § 3553(a) FACTORS

#### A. Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

Charlie is not a particularly complicated person. For those who know him, as reflected in the many letters written to the Court, Charlie is a family oriented, hardworking, loyal, faith-based man with a heart of gold. In many ways Charlie's most admirable traits, optimism and trust, proved to be leading contributors to the legal issues he faces today. Remarkedly, even while sitting in jail awaiting sentencing and in many ways at the crossroad of his life, Charlie, instead of being self-absorbed, focused his attention to lives of other jail inmates and convinced them to attend regular Bible study courses in order to bring God into their lives. That is Charlie to a tee.

Charlie has lived a life of being a difference maker. Certainly not perfect, certainly not without flaws, or capable of errors in judgment, Charlie is a people person. If you are Charlie's friend, and as the letters to the Court (**Attached as Exhibit "B"**) reflect, you are a friend for life. Family, is a word that invariably comes to mind for those describing what is most important to Charlie.  For Charlie, there is his immediate family with his wife Christi, who has dedicated her life and career to elementary education, his two teenage sons, Jack and Casey, and their two dogs Gus and Georgia.




Charlie, one of two siblings, is the son who tries to spend as much time with his now elderly parents who suffer from various health ailments. Charlie has been the son who will travel to his parent's house to assist in the basic of household necessities. As Christi describes in her letter "Charlie shows them patience, dignity and love-never viewing their care as a burden but as a responsibility he embraces wholeheartedly with happiness".

He is also the brother-in-law, who when learning that his wife's sister's child would likely be born with Down Syndrome, not only offered positive reassurance, but once Graham was born became a mainstay and an advocate for his nephew. Charlie sponsored a Mighty Steps for Down Syndrome event in 2022 and then walked with Graham and family in the 2023 National Buddy Walk through Times Square in New York City.




10

In addition, Charlie's devotion extended to starting a company with his family known as "Happy Golf" whose mission is to raise awareness, promote inclusion and encourage acceptance of society for children with Down Syndrome. Happy Golf provides golf gloves and other accessories to children with special needs participating in golf camps.

 

One of the aspects that makes Charlie unique is that "Family" is not limited to his immediate relatives. Attached letters reflect that Charlie has maintained a family of friends for decades. Representative of the family of friends is the letter from Executive Vice President for Fox Corporation, Jamie Gillespie, who writes about the man he has literally known from birth:

> "From as early as I can remember Charlie has stood out for his leadership and empathy. While he faced early challenges, particularly with learning disabilities that made reading more difficult, he met them with perseverance and drive that now defines him as an adult. On the football field in high school, Charlie was the heart of our team. As our middle linebacker… he acted as our coach on the field constantly lifting others up. Off the field Charlie was the glue that of our friend group, the one who brought us all together and made sure no one felt left out. He was also the convener, the gravitational force everyone wanted to be friends with. This inclusive spirit extended far beyond school and was felt throughout the community."

And then Charlie has/had his business family centered around his other "baby" SafeChain, which personified the culmination of Charlie's perseverance and drive. Understandably, when Charlie spoke of SafeChain he exuded with pride. This was no fly by night company.



Charlie instilled his sense of purpose, positivity, and principles in SafeChain as reflected on the walls of the SafeChain.



What made SafeChain special for Charlie were the employees who he treated as family.

Dakota Flowers wrote to the Court:

> "Charlie gave me an opportunity when he hired me, seeing potential and growth in me that I had not fully recognized in myself. Charlie's commitment to the growth and well-being of others extends far beyond my own personal experience. He consistently demonstrated genuine care for his employees, treating each of us like family."

Tracy Simmons Taylor describes herself as being considered Charlie's "work mom." Ms. Taylor describes the SafeChain environment Charlie sought to establish "to make every employee feel like they were part of the work family. Charlie is a man that is all about family; whether it is his personal family or his work family." For Ms. Taylor's 10th anniversary at SafeChain, Charlie paid off the remainder of Ms. Taylor's home mortgage in recognition of her loyalty and service. Ms. Taylor writes:

> "Some of Charlie's most notable contributions to the community were his love for the children at Christmas time when he led our team to collect toys and items for children who were less fortunate. He sent care packages to the troops that could not be home for Christmas. Growing vegetables on the plant grounds in planter boxes to give to the Food Bank was a way to show dedication for fresh vegetables to be shared with the community. When the hurricane hit North Carolina, Charlie gave items such as medical supplies, toiletries, and food to help ease the suffering from those devastated by the hurricane. Once an employee suffered as their house caught fire, and Charlie was there with assistance so the employee and their family could have basic provisions to help them through the difficult time. Charlie recognized the importance of nurses in the community by hosting a Nursing recognition day. … Charlie also had recognition day for law enforcement officers."



Charlies' philanthropy and passion was shared with persons he never met, as well as persons he worked with and knew.

The attached letters are replete of instances of Charlie comforting others when receiving adverse medical diagnosis, when they lost a parent in car accident, or traveling two hours to attend the wake for a friend's parent. As JP Finlay writes:

> "A loyal and true friend.  Charlie is the type of guy to give the shirt off his back for a friend or help a stranger in need."

Two additional letters deserve recognition. One is from Anthony Berger, a former shareholder/investor of SafeChain:

> "Additionally, I imagine that I am in a somewhat unique situation as a letter-writer for Charlie, due to my role as a former investor/shareholder in SafeChain.  As such, I certainly would have been in a more favorable financial position had the circumstances of this case not arisen.  Therefore, one might assume that I would not be inclined to support Charlie, however, nothing could be further from the truth.  To the contrary, I do not hesitate to provide this letter of character reference. In my experience, the circumstance of this case absolutely does not reflect what I know to be the character of Charlie. … I understand and respect the decision of the jury and Charlie's responsibility for his actions.  Nevertheless, in my opinion, the events of this case perhaps reflect acts of inexperience and naiveite rather than intentional commission.  They are a complete aberration from previous behavior that I have witnessed from Charlie. I cannot reconcile the differences, but I encourage you to accept at his core, Charlie is a very good person, father and citizen, and factor that into your sentencing decision."

14

The second letter is from August Matteis, the attorney who represented Charlie in the Eastern District of New York civil "Gilead" lawsuit.

> "I believed that Gilead was bullying the Boyds to cover up its own conduct in allowing tens of thousands of HIV pill bottles to enter the Black-Market through its free drug clinic program. I further believed that if Charlie did anything wrong, it was the result of his lack of sophistication in a very aggressive industry and his positive outlook on humanity that may have led him to trust people more than he should have."

There is no question that SafeChain purchased and ultimately sold Black-Market HIV drugs. Charlie lacked extensive experience with HIV or "branded" drugs and was convinced to have SafeChain enter into the HIV market by Adam Brosius. Charlie relied upon Brosius' knowledge of the HIV drug industry and believed that Brosius would not steer SafeChain into areas of noncompliance with rules, regulations or laws. When SafeChain commenced involvement in HIV transactions in the Spring of 2020, Charlie had no reason to believe that SafeChain would be dealing in Black-Market HIV drugs.

No one at SafeChain realized that the initial SafeChain source of HIV drugs, Boulevard, had submitted forged and fictitious documentation representing that Boulevard was a New York licensed wholesale distributor. Had SafeChain not been duped into believing that Boulevard was properly licensed, SafeChain would not have engaged in any business relationship with Boulevard, who had been brought to SafeChain by Brosius. It is unclear whether Brosius knew from the outset that Boulevard was a fraudulent company. At no time did Brosius inform Charlie that Boulevard was selling Black-Market HIV drugs to SafeChain. For that matter, Brosius never informed Charlie that prior to his involvement with SafeChain, Brosius was under criminal investigation for Brosius' involvement in an unrelated health care fraud. When Brosius was indicted in the summer of 2020

in the District of New Jersey, Brosius lied to Charlie, informing Charlie that Brosius was innocent of any of the allegations. Charlie mistakenly believed Brosius' lie.

When Boulevard failed to provide pedigree documentation with its HIV drugs being sold to SafeChain, Charlie accepted Boulevard's explanation, through its supposed owner Peter Khaim, that Boulevard did not have the pedigree information since Boulevard had purchased the HIV drugs from pharmacies that had gone out of business or sold off inventory at reduced prices due to Covid or other legitimate reasons. When Charlie learned that Boulevard produced what proved to be false pedigree documentation, Charlie mistakenly did not immediately terminate all business relationships with Boulevard, but instead agreed to allow Boulevard HIV purchases based on substitute documentation.

Likewise, when four other HIV vendors were brought to SafeChain by Brosius, Charlie erroneously believed that the vendors representations that they were either authorized distributors of HIV drug manufacturer Gilead or had purchased HIV drugs from Gilead authorized distributors. When SafeChain discovered or learned that these other HIV vendors were providing false information to SafeChain, Charlie accepted excuses for the false information, instead of immediately terminating business relationships.

As it turned out, for approximately fourteen months SafeChain was purchasing and then selling Black-Market HIV drugs. SafeChain was at the bottom of the Black-Market distribution chain, and prior to pharmacies who purchased the HIV drugs, the only legitimate company involved in the chain. The flow of diverted HIV drugs into the Black-Market was orchestrated and manipulated by individuals that Gilead described in the Eastern District of New York civil case as "Kingpin Defendants". These individuals facilitated and secured the HIV drugs primarily through buyback schemes while limiting their personal identity to few other individuals who comprised

16

and established a network of makeshift entities that attempted to create the appearance of legitimacy and ultimately sell the HIV drugs to SafeChain. SafeChain, believing that the HIV drugs it was purchasing was from legitimate state licensed companies, then sold the HIV drugs to pharmacies.

For reasons unknown to Charlie, neither Brosius, any lawyers from the prominent health care law firm representing SafeChain, any SafeChain executives, any Gilead representatives, or the FDA representatives raised the likelihood that SafeChain was transacting in Black-Market HIV drugs. The July 2021 Gilead civil lawsuit and subsequent amendments naming SafeChain and the Boyds set forth the Black-Market scheme, including individuals and representations totally foreign to Charlie. In February 2024, SafeChain and the Boyds settled the Gilead lawsuit paying an aggregate of $2.7 million dollars, with SafeChain paying $1,925,160.35 and Charlie paying $727,317.38. (**Attached as Exhibit "C"**).

> ### B.  Need for Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment.

Charlie is not seeking a sentence void of incarceration. The ultimate question will be the amount of incarceration imposed. Charlie is not suggesting Charlie's convicted offenses are not serious. It is significant in evaluating the offenses for which Charlie was convicted that the jury did not make a finding that Charlie had conspired to introduce or deliver into interstate commerce adulterated drugs with the intent to defraud, or a finding that Charlie conspired to defraud the FDA. (D.E. 213 at 1). Likewise, the jury did not decide that Charlie conspired to knowingly and falsely make or alter the labelling or documentation of a pre-retail medical product. (D.E. 213 at 2). The categories that the jury did not make a finding of Charlie's responsibility in Counts 1 and 4 represent a more serious violation of the applicable statutes and would support a more severe

sentence. The absence of those jury determinations also distinguishes Charlie from individuals who have been sentenced for conduct Charlie's jury declined to attribute to Charlie.

### C. Need for Sentence to Afford Adequate Deterrence

Charlie is well known in his community and unlike others involved in the HIV drug Black-Market was associated with a legitimate business. A period of incarceration of an individual with Charlie's circumstances would provide more than adequate deterrence to any others not to make the mistakes made by Charlie.

### D. Need to Protect the Public from Further Crimes of the Defendant

Charlie has already demonstrated his acceptance of consequences for his actions in settling the Gilead civil lawsuit for $2.7 million dollars.  Charlie recognizes his errors in judgment that led to his case. More than anything, Charlie recognizes the horrific pain that he has placed on his family and would never again even approach an area or circumstances that would endanger putting his family in that situation again. The many letters from people who really know Charlie consistently assert that his conduct in this case is in fact, an aberration of his good character. There is no reason to doubt their confidence in Charlie.

### E. Need for Sentence to Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner

Charlie would request that the Court incorporate a recommendation that Charlie be considered for the RDAP program based on the assessment made prior to time of trial.

## IV. GROUNDS FOR DOWNWARD VARIANCES

### A. The Guideline Calculation Overstates the Seriousness of the Offenses

There should be no question that the current Sentencing Guideline Calculation of Level 53, reduced to Level 43 in the draft PSR, providing for a sentence of life in prison, overstates the

seriousness of the offenses. That a first time, economic crime offender, would have a Guideline score equivalent to a Guideline score for first degree murder (§2A1.1 U.S.S.G.) or Treason (§2M1.1 U.S.S.G.) constitutes prima facie evidence that Charlie's Guideline Calculation is overstated. Charlie's objections to the draft PSR guideline calculations filed with the Court (D.E. 268) and this pleading have disputed the draft PSR Guideline Calculations. In particular, Charlie has contended that if Charlie's PSR loss amount objection is overruled, Charlie should score the same offense level Sentencing Guideline calculation, absent a three-point acceptance of responsibility reduction, that was calculated for co-defendant Adam Brosius.

Charlie has not received the final PSR and any adjustments to the draft PSR Sentencing Guideline calculations based on Charlie's objections. Rather than delay submission of this Sentencing Memorandum, or seek delay in the March 13, 2026 sentencing hearing, Charlie is proceeding under the assumption that the Probation Office will not make any significant Sentencing Guideline calculation adjustments.

The issue of Sentencing Guideline calculations of level 43 overstating the seriousness of economic fraud offenses has previously arisen in this District. On multiple occasions Southern District of Florida sentencing courts have applied downward variances to remedy level 43 sentencing calculations that overstate the seriousness of offenses.

For instance, in United States v. Esformes Case No. 16CR-20549, described by the Department of Justice in their July 22, 2016 press release as "the largest single health care fraud case ever brought against individuals by the Department of Justice", lead defendant Phillip Esformes scored a level 43 Sentencing Guideline calculation following his jury trial conviction. Judge Scola sentenced Esformes to a twenty-year sentence in what the same press release described as a "one-billion-dollar scheme". (D.E. 1387 Case No. 16CR-20549).  In United States v. Salemi,

Case No. 19CR-20674, Judge Gayles, sentenced HIV drug diversion defendant Mohammad Salemi to a sentence of 103 months incarceration following his guilty plea and scoring a level 43 Sentencing Guideline calculation (D.E. 262 Case No. 19CR-20674). Likewise in United States v. Miller, Case No. 12CR-20757, Judge Martinez sentenced Daisy Miller to a sentence of 180 months incarceration following a jury trial involving a $39 million health care fraud jury trial conviction and an offense level calculation of level 43. (D.E. 543 Case No. 12CR-20757).

In seeking a downward variance from the level 43 Sentencing Guideline calculation, Charlie does not assert that the offenses for which he has been convicted are not serious. Rather, Charlie submits that the level 43, life in prison calculation, overstates the seriousness of the offense and therefore, supports a downward variance.

**B. A Downward Variance is Necessary to Avoid Unwarranted Sentence Disparity**

Charlie submits that a downward variance is necessary to avoid unwarranted sentencing disparities based upon the requirements of 18 U.S.C. §3553(a)(6). Charlie recognizes that the disparity provision set forth in 18 U.S.C. §3553(a)(6) relates to "defendants with similar records who have been found guilty of similar conduct". In this request for downward variance, Charlie identifies individuals within the scope of that provision, as well as, individuals of equal or greater culpability who have never been charged.

Sentence Disparity analysis obviously begins with co-defendant Adam Brosius, who after entering a guilty plea, was sentenced by this Court to a 97-month period of incarceration on November 10, 2025 (D.E. 239). Brosius was sentenced without a Government cooperation downward departure motion. Brosius, unlike Charlie, was sentenced after a guilty plea as opposed to being sentenced following a jury trial conviction. Based on that distinction, Brosius received a three-level acceptance of responsibility reduction, that Charlie is ineligible to receive.

However, other factors involving Brosius' conduct support Charlie's sentence being less than the 97-month Brosius sentence even with Brosius receiving the three-level acceptance of responsibility reduction. Initially, Brosius committed his criminal conduct while under indictment in the District of New Jersey for allegations of a multi-million-dollar health care fraud. Brosius lied about his culpability in the New Jersey case to Charlie to facilitate Brosius' ability to financially benefit from the sale of HIV drugs. Each of the five fraudulent HIV drug suppliers to SafeChain were companies that Brosius introduced and brought to SafeChain. Adam Brosius, as opposed to Charlie, had contact and communication with other individuals who have been identified as intermediaries and conduits to the ultimate sources of the Black-Market HIV drugs. According to Gilead's pleading in the Eastern District of New York civil case, Brosius maintained communication with John Levitan who is a convicted money laundering expert that facilitated money laundering activity for individuals in the HIV fraud scheme. In fact, on June 16, 2025 (after Brosius' guilty plea in this case), Gilead filed a Status report in the Eastern District of New York that stated the following:

> From the start, settlement was cut off at the knees by Brosius's assertion – which he stated under oath at his deposition – that during the course of this litigation he gave away essentially all of his remaining assets, over $2 million cash, to his co-defendant John Levitan, a convicted money-launderer. Brosius testified that he gave his final $2 million to his money launderer friend as repayment for a loan, but claimed he had no documentation of the loan and could not remember the loan's purpose.

> **(Attached as Exhibit "D")**.

The Eastern District of New York case cites Jorge Caba, a fraudulent HIV vendor providing Levitan and Brosius with an email that included a sample of a fraudulent pedigree that was going to be presented to SafeChain.

21

Adam Brosius travelled to personally meet with Peter Khaim ("Khaim"), the owner of HIV supplier Boulevard, on at least two occasions during the course of the alleged conspiracy and even after the discovery of Boulevard's fraudulent license and subsequent termination, Brosius continued to communicate with Khaim via multiple encrypted applications to "talk about other companies and wholesalers". (**Attached as Exhibit "E"**). Charlie, on the other hand, never personally met with Khaim and only telephonically spoke to Khaim on one brief occasion. Khaim, according to the Government, was responsible for the sale of $35,146, 095 of diverted HIV drugs. Despite being a multiple convicted felon, Khaim was never prosecuted for any of his $35 million transactions.

Brosius received 75% of gross proceeds from the sale of HIV drugs to pharmacies as opposed to Charlie who received a portion of the net after cost portion of the remaining 25%. Brosius claimed that he was aware of Gilead manufacturing issues accounting for wrong pills in Gilead HIV bottles and represented that he was only involved in HIV sales despite being the conduit and interacting with all SafeChain HIV suppliers.

Charlie Boyd entered into a settlement agreement with drug manufacturer Gilead, involving approximately $2.7 million dollars. Of the approximately $2.7 million settlement, SafeChain paid $1,925,160.35 and Charlie paid $727,317.38, including his life insurance policy. On the other hand, Brosius, to Charlie's knowledge, despite making millions of dollars for his participation in the alleged conspiracy, has not paid any monies to Gilead. In fact, on February 5, 2026, a Certificate of Default was filed against Brosius (and many others) in the Eastern district of New York case. (Attached as Exhibit "A" Supra).

The Eastern District of New York civil case filed by Gilead is now in its Sixth Amended Complaint. In its pleadings, Gilead has identified the hierarchy of the Black-Market HIV drugs

scheme, tracing the drugs from entry into the supply chain until sale to pharmacies. The two Kingpins in the HIV Black-Market were identified as Lazaro Roberto Hernandez and Armando Herrera. Hernandez was indicted in <u>two</u> Southern District of Florida cases. One of the two cases is cited in the draft PSR, Case No. 22CR-60129. That case involved the Kingpin Hernandez being responsible for selling $232,800,000 of Black-Market HIV drugs. Hernandez received a 180-month sentence. In a second HIV case, Case No. 19CR-20674 Hernandez, a category 3 criminal history defendant received a sentence of 168-month sentence concurrent with the 180-month sentence.

### C.    Charles Boyd's Pre-Indictment Payments to Gilead

Attached to this Sentencing Memorandum is Charlie's pre-indictment Settlement with Gilead which includes Charlie's contribution to the approximately $2.7 million dollar settlement payment. The Government has filed a victim impact statement from Gilead (D.E. 270-2). Charlie's payments, both personal and corporate (SafeChain funds), to Gilead represent pre-indictment victim compensation that can be considered a basis for downward variance. Unfortunately, Gilead's victim impact statement fails to mention that Charlie and SafeChain have previously settled their matter with Gilead with Gilead receiving approximately $2.7 million dollars. Apparently, in its haste to castigate Charlie further, Gilead also forgot to mention that it intentionally withheld information from SafeChain that would have provided SafeChain with knowledge concerning Black-Market HIV drugs SafeChain was purchasing. (**Attached as Exhibit "F"**).

### D.   Charles Boyd's Extraordinary Charitable and Philanthropic History

Despite all attempts to villainize Charlie, the truth is that Charlie is a man of incredibly good will and charity.  The letters addressed to the Court document how Charles Boyd has been a difference maker in the lives of others. Even while incarcerated, Charles Boyd has reached out to

other inmates and encouraged them to participate in Bible studies. Under any measurement Charles Boyd's charitable and philanthropic commitment has been extraordinary and should be considered as a basis for downward variance. That commitment is set forth in the chart below representing SafeChain activities organized by Charlie.

| COMMUNITY OUTREACH | ORGANIZATIONAL OVERVIEW | CHARLIE'S CONTRIBUTIONS |
|---|---|---|
| Wreaths Across America | Remember the fallen. Honor those who serve. Teach the next generation the value of freedom. Our volunteers are the beating heart of the program and work year-round to share this important mission and inspire others to join. | Donated wreaths to be placed at Arlington National Cemetery for National Wreaths Across America Day. |
| Habitat for Humanity | Habitat for Humanity is a global nonprofit housing organization dedicated to creating a world where everyone has a safe, decent, and affordable place to live. Operating in all 50 states and more than 70 countries, Habitat empowers families through homeownership, financial education, and community partnerships. | SafeChain employees assisted in building a home in Cambridge and providing items first time home owners need (kitchen supplies, etc). |
| Comfort Keepers | Comfort Keepers is a leading, nationwide in-home care provider that helps seniors and adults maintain independence, safety, and comfort in their own homes. They provide customized services—ranging from companion care and light housekeeping to personal care, dementia support, and transportation—with a focus on "interactive caregiving" to improve emotional and physical well-being. | SafeChain organized a food drive to donate to seniors in need. |
| Sailwinds Park Clean-Up | Sailwinds Park is a scenic, waterfront park in Cambridge, Maryland, situated along the Choptank River at the foot of the Bridge. It serves as a popular tourist stop, featuring a visitor center with a 100-foot-tall "sail" structure, a playground, a mile-long walking boardwalk, and a small beach area. | SafeChain employees met at this park (the first thing people see when entering Cambridge) to do a beach cleanup. |
| Donation to Employees' Charities of Choice | Charities varied: | SafeChain donated $100 to each employee's charity of choice. |

| | | |
|---|---|---|
| Robin Hood Shop | The Robin Hood Shop in Cambridge, Maryland, is a long-standing, volunteer-run thrift store located at 416 High Street. Founded in 1957, it sells gently used clothing, furniture, housewares, and collectibles to support the University of Maryland Shore Medical Center Dorchester. | SafeChain employees organized a drive to donate gently used items to the local thrift shop. |
| Patriot Point | Patriot Point is the Military Bowl Foundation's 294-acre retreat that provides a safe, secure and tranquil outdoor recreational retreat facility for wounded, ill, and injured, active-duty service members, veterans, their families and caregivers who face daily struggles related to their time spent defending our great nation. | For Giving Tuesday, SafeChain employees voted to donate funds to Patriot Point. |
| I GOT This Foundation | I GOT THIS Foundation has a mission to promote golf instruction and playing opportunities for people with Down syndrome and other intellectual disabilities. | For Giving Tuesday, SafeChain employees voted to donate funds to The I GOT This Foundation. |
| Eastern Shore Hospital Center | The Eastern Shore Hospital Center in Cambridge, MD, is a state-run psychiatric facility dedicated to providing high-quality, trauma-informed, and recovery-oriented inpatient mental health services to adults (18+) on the Eastern Shore. Its mission focuses on empowering patients as active partners in treatment, reducing stigma, and serving individuals involved in the judicial system. | SafeChain employees participated in the Great Chesapeake Wellness 5k Run/Walk. All proceeds were split between the Eastern Shore Hospital Center and ESHC Auxiliary. |
| ESHC Auxiliary | The Eastern Shore Hospital Auxiliary is a volunteer-driven, 501(c)(3) organization established in 1952 to provide direct financial and volunteer support to patients at the Cambridge-based psychiatric facility. It raises funds for patient activities and programs through the "A. May Thompson" and events like a Fashion Show/Holiday Bazaar. | SafeChain employees participated in the Great Chesapeake Wellness 5k Run/Walk. All proceeds were split between the Eastern Shore Hospital Center and ESHC Auxiliary |
| Stockings for Heroes | Soldiers' Angels Holiday Stockings for Heroes is a campaign that sends stuffed holiday stockings to deployed service members, veterans, and VA hospital patients. Volunteers fill stockings with items like snacks, toiletries, and games to provide comfort and holiday cheer. | SafeChain employees collected items and prepared stockings to be sent to the Stocking for Heroes campaign. |

| | | |
|---|---|---|
| Treats for Troops | Treats for Troops is a Soldiers' Angels program that collects excess, unopened Halloween candy from the public to send to deployed service members, veterans, and military families. It aims to reduce waste while boosting the morale of troops overseas with a "taste of home" | SafeChain employees collected unwanted Halloween candy and shipped it to deployed service members. |
| Dorchester Santa Toy Drive | The Dorchester Santa Toy Drive is an annual community initiative, often associated with local EMS or community groups, that collects new, unwrapped toys and monetary donations to provide Christmas gifts for children in need. | SafeChain employees and their families participated in providing toys each year for the toy drive. |
| Kona Ice | Kona Ice's mission is to spread joy, smiles, and fun to communities nationwide through a unique, premium shaved ice experience. Founded in 2007 to revolutionize the traditional ice cream truck, the company focuses on delivering a fun, tropical, and interactive experience while actively giving back to local schools, teams, and non-profits. | SafeChain rented a Kona Ice truck to give nurses a treat during Covid |
| Ice Cream for First Responders | The Scottish Highland Creamery in Oxford, Maryland, is dedicated to sharing happiness, one scoop at a time, by creating wholesome, high-quality, handcrafted ice cream. Their passion is to blend premium ingredients into a "little scoop of happiness" that brings families and the community together. | SafeChain donated ice cream for First Responders |
| Hurricane Helene Relief | Hurricane Helene hit Florida in 2024 as a Category 4. | SafeChain employees collected items to send to victims and first responders. |
| The Country School | The Country School in Easton, MD, aims to foster excellence, develop strong character, and instill a lifelong love of learning in a nurturing, PreK-8 environment. Founded in 1934, the school focuses on the whole child, combining rigorous academics with 9 core values including honesty, respect, and responsibility to prepare students for future success. | SafeChain provided PPE for this school during Covid free of charge. Items included thermometers for every classroom, hand sanitizer, masks, and gloves. |

## V.  **CONCLUSION**

Early this morning the Government filed its Sentencing Memorandum and Response to Defendants' PSR Objections (D.E. 271). Boyd's PSR Objections were filed on February 13, 2026, nearly one month ago.  It is unclear why the Government waited to file its Response on the eve of sentencing. In its pleading, the Government appears to be acknowledging that the life incarceration exposure based on the PSR sentencing guideline calculation overstates the seriousness of the offenses. However, the Government recommends multiple decades of incarceration. That recommendation far exceeds any sentence received by any individual charged with involvement in any HIV Black-Market case.  Even with the Sentencing Guideline differential created between an individual convicted at trial, as opposed to having entered a guilty plea, the sentencing disparity advocated by the Government is not sustainable. The Government's recommendation amounts to a <u>defacto</u> trial penalty and should be rejected by the Court.

When examined within the accepted criteria of 18 U.S.C. §3553(a) Charlie Boyd's sentence should not even approach the sentence of HIV Black-Market Kingpin Hernandez, whose volume of HIV Black-Market dealings more than <u>tripled</u> those of SafeChain's. Hernandez, despite the Government's attempted cosmetic triage, is indisputably the head of the Black-Market HIV food chain as part of a continuation of his criminal conduct. (<u>**See**</u>, **Attached Exhibit "G"**).

Similarly, Charlie Boyd's sentence should not approach the sentence of co-defendant Brosius, who the Government failed to call at trial due to Brosius' inescapable baggage that would have fatally damaged the Government's case. Brosius' claim that he was merely a salesperson hardly survives scrutiny, nor does the Government's assertion that Brosius is less culpable because he did not spend time at the SafeChain offices. Brosius was not at the SafeChain offices because, while under health care fraud indictment from the District of New Jersey, he was busy meeting,

conversing with, and making deals with the higher levels of the HIV Black-Market food chain, including multiple meetings with Peter Khaim. The trust that multiple players in the HIV Black-Market food chain had with Brosius to meet with him (in-person) and reveal their actual identities demonstrates that, contrary to Brosius' assertions of being an outsider, Brosius was a much more significant participant than Charlie Boyd, who never met any of the real players face to face. And that doesn't even address the financial differential of HIV drug profits between Brosius and Charlie Boyd, or the payment of approximately $2.7 million dollars to Gilead by SafeChain and Charlie Boyd as opposed to Brosius' documented game playing and default judgment.

Charlie Boyd, based on all of the pertinent sentencing factors discussed in this pleading, requests a sentence of no more than 5-years' incarceration and a recommendation by the Court that he be enrolled in the RDAP program at the Federal Bureau Prison where he is assigned.

Dated: March 11, 2026

By: s/ Bruce A. Zimet, Esq.
Florida Bar No. 0225053
**BRUCE A. ZIMET, P.A.**
1555 Palm Beach Lakes Blvd., Suite 1400
West Palm Beach, FL 33401
Tel: (561) 508-7741
Tel: (954) 764-7081
Email: BAZ@BruceAZimetLaw.com
*Counsel for Charles Boyd*

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Southern District of Florida by using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: March 11, 2026

**By: s/ Bruce A. Zimet, Esq.**
Florida Bar No. 0225053
**BRUCE A. ZIMET, P.A.**
1555 Palm Beach Lakes Blvd., Suite 1400
West Palm Beach, FL 33401
Tel: (561) 508-7741
Tel: (954) 764-7081
Email: BAZ@BruceAZimetLaw.com
*Counsel for Charlie Boyd*
